IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KENNETH PAUL MYERS,

        Plaintiff,

        v.                         Civil Action No. 2:10-CV-69

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

**REPORT AND RECOMMENDATION
CLAIMANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED**

**I. Introduction**

A.    Background

    Plaintiff, Kenneth Paul Myers, (hereinafter "Claimant"), filed his Complaint on June 1, 2010 seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (hereinafter "Commissioner").[1] Commissioner filed his Answer on August 4, 2010.[2] Claimant filed his Motion for Summary Judgment on September 3, 2010.[3] Commissioner filed his Motion for Summary Judgment on October 4, 2010.[4]

---

[1] Dkt. No. 1.

[2] Dkt. No. 7.

[3] Dkt. No. 10.

[4] Dkt. No. 11.

B.    The Pleadings

    1.    Plaintiff's Motion for Summary Judgment.

    2.    Defendant's Motion for Summary Judgment & Memorandum in Support.

    3.    Plaintiff's Response to Defendant's Motion for Summary Judgment.

C.    Recommendation

    For the following reasons, I recommend that:

    1.    Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because Claimant's RFC

is reserved for the ALJ.

    2.    Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same

reasons.

## II.  Facts

A.    Procedural History

    Claimant filed an application for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") on May 21, 2008, alleging disability due to seizures, loss

of bodily functioning and epilepsy. (Tr. 59, 169).  The application was initially denied on June

25, 2008, and September 30, 2008. (Tr. 56, 97).  Claimant requested a hearing before an

Administrative Law Judge (hereinafter "ALJ") on October 4, 2008, and received a hearing on

November 16, 2009 before the ALJ in Morgantown, West Virginia. (Tr. 27, 100).

    On November 27, 2009, the ALJ issued a decision adverse to Claimant finding that the

Claimant "has not been under a disability, as defined in the Social Security Act, from February

28, 2008 through the date of this decision (20 CFR 404.1520(g) and 416.920(g))." (Tr. 21).

Claimant requested review of the ALJ's decision by the Appeals Council, however, Claimant's

request was denied on March 30, 2010. (Tr. 1). Claimant filed this action, which proceeded as set forth above, having exhausted his administrative remedies.

B.    Personal History

Claimant was born on April 13, 1963, and was forty-four (44) years old on the onset date of the alleged disability and forty-six (46) years old as of the date of the ALJ's decision. (Tr. 139). Under the regulations, Claimant was considered a "younger individual" aged 45-49, and generally, one whose age will not "seriously affect [Claimant's] ability to adjust to other work." 20 C.F.R. §§ 404.15639(c), 416.963(c) (2010). Claimant reported the 10th grade as the highest grade of school completed. (Tr. 173). His prior work experience consists of a laborer in a sawmill as well as a truck driver. (Tr. 170).

C.    Medical History

The following medical history is relevant to the issues of whether substantial evidence supports the ALJ's finding that the Claimant could perform a range of sedentary work as well as the ALJ's credibility determination relative to the Claimant:

**Dr. Muhammad Rahman, 05/07/2008-05/21/2008 (Tr. 231-233)**
5/7/08: Neurology Consultation
-HPI
      *Mr. Kenneth Myers is a 45-year old right handed male, who complains of episodes of brief shaking and jerking and confusion. The first episode was about two years ago. He had multiple episodes since then. He described the episode as briefly confused, unresponsiveness, followed by cough and shaking and jerking. It may last from seconds to a minute with postical confusion and headache and sleep. Some of the events are associated with loss of bladder control. He does not have any history of tongue bite. He says that he can have almost everyday the episodes and he is aware of the surroundings. The frequency of the spells have [sic] increased recently. Sometimes he may have warning and he knows that the spell is coming, but he is aware of the surroundings. Sometimes he may have warning and he knows that the spell is coming, but he is unable to control. **He had a CT scan of the head a couple of months ago and is negative.** He complains of mild headache everyday for about one year. He described the headache as over both sides of the head and back of the head as pressure, sometimes maybe pounding.

Not associated with any nausea or vomiting or photophobia or phonophobia. He has headache almost everyday for about one year. **(Emphasis added).**

-Work History:

He does not work now since [sic] about 4 or 5 months. He is a truck driver.

-Social History:

**He smokes 1 pack per day.** He only occasionally drinks alcohol. He does not give any history of anxiety, depression or psychiatric illness.

-Review of Systems:

He complains of dizziness and blurred vision. **He does not complain of any cardiovascular, respiratory or gastrointestinal symptoms**. He has a history of kidney stone and had surgery. **He complains of seizure.** The remainder of the review of systems is non-contributory.

-Physical Examination:

Blood pressure is 120/80, pulse 70, respiratory rate 20. Weight is 278. Skin, cardiac chest and abdominal examination is unremarkable. HEENT is unremarkable. Neck is supple. Neurologic examination- he is awake and oriented. Speech is fluent. Cranial nerve examination II through XII- FERRLA, extraocular movements intact. Face is symmetrical. Tongue in the midline. Palates elevate symmetrically. Motor examination- muscle tone and bulk normal. Strength is bilaterally symmetrical 5/5 both upper and lower extremities proximally and distally. Deep tendon reflexes are bilaterally active and symmetrical, 2+ biceps, triceps, brachioradialis, patella tendons and Achilles' tendon. Plantars are downgoing. Sensory examination to soft touch, position, vibration is unremarkable. Gait and coordination-finger-to-nose test normal. Gait is normal and regular.

-Impression:

1. Seizure. First Seizure onset about two years ago, has had multiple events since then. Frequency has increased. Recommend EEG to evaluate for seizure. Appears to be complex partial seizure.

2. Headache mixed with tension type headache and chronic daily headache for the last one year. Try Gabapentin 300 mg p.o. g.h.s. for a couple of days. Increase to 1 twice a day to continue and recommend EEG to evaluate for seizure.

3. History of kidney stone. He had surgery in 2001.

4. Anxiety and depression and pseudoseizure. He is for follow-up in a couple of months after EEG.


5/21/08: Electroencephalogram

-Comment:

This digital EEG was recorded using 18-21 scalp and ear electrodes employing the 10-20 International Electrode Placement system and reviewed using multiple referential and bipolar montages.

The awake resting background consists of 10 to 11 herts low to medium amplitude posterior dominant rhythm, which blocks with eye opening. The rest of the background consists of polymorphic theta activity from the frontal and central head regions. During brief periods of drowsiness, the posterior dominant rhythm drops out and medium amplitude 4-6 theta activity is

seen. Bilateral vertex and sleep epindles are noted during periods of sleep in Stage I and II. Photic stimulation using multiple flash frequencies produced moderate photic driving. Hyperventilation produced build up of theta activities in the background.
-Impression:

     **Normal awake**, briefly drowsy and sleep stage I and II EEG.


**Buckhannon Medical Care, 2/29/2008-5/22/2008 (Tr. 234-240)**
2/29/08:
CC: new patient visit
HPI: Illegible, sometimes I shake, feel it (illegible), denies (illegible), no significant past history
Review of Systems:
    -Neurological: seizures, see chart
    -General: alert, oriented, non-distressed, vs WNL, good eye contact
    -Head/Face: atraumatic
    -Eyes: perrla, eomi, fundi WNL, schlera White conjunctive clear
    -ENT: EAC NL
    -Neck: supple
    -CVS: RRR, Perf PulsesNL
    -**Resp: Clear**, BS Equal bilet
    -ABD: Soft, nontender, flat, NLBS
    -Neuro: CN 2-12 Intact, DTR's 2/4 bilet, S/M/C grossly intact
Medical Decision Making
    -thyroid problem, CT of brain (illegible)
Diagnosis:
    -Seizure-like activity
Plan:
    -absolutely no driving, climbing, etc. No dangerous activity, jobs, (illegible), imaging study, refer Dr. (Illegible), illegible
3/6/ 08:
Davis Memorial Hospital, CAT 2013- CT Head w/o and with contrast (70470)
Full Result:
    -CT head, unenhanced and enhanced
    -Axial imaging through head without and with contrast shows no hemorrhage, mass effect, midline shift or hydrocephalus and no abnormal enhancement is seen. Visualized paranasal sinuses are clear.
Impression:
    -**Negative CT head.**


5/22/08:
CC: follow up, illegible
HPI: F/u, neurology, illegible, illegible, lt. Still occurring, no change in cholesterol
Past History: Seizure disorder
Review of Systems:
    -**Neurological: seizures-improved**

       -General: Alert, oriented, non-distressed, good eye contact
       -Neck: supple, throid normal
       -CVS: RRR
       -**Respiratory: Clear,** BS Equal bliet
       -Neurological: CN 212 Intact, DTR's 2/4 bilat S/V/C grossly intact
Medical Decisionmaking:
       -Ideal CTO
Diagnosis:
       -seizure disorder
       -back pain, low
       -Hyperlyalemia
Plan:
       -Illegible, liptor 10 (illegible), Discord r/e (illegible), <u>absolutely</u> no driving, climbing,
       etc., follow up neurology important! Ex or RFC for illegible concerns


**<u>Dr. Porfirio Pascasio, Residual Functional Capacity Assessment, 6/24/2008 (Tr. 241-248)</u>**
<u>6/24/2008:</u>
Exertional Limitations:
       -Occasionally lift and/or carry 50 pounds
       -Frequently lift and/or carry 25 pounds
       -Stand and/or walk (with normal breaks) for a total of about 6 hrs in an 8-hour workday
       -Push and/or pull–> unlimited, other than as shown for lift and/or carry

Postural Limitations:
       -Climbing (ramps/stairs), occasionally  (due to HX of pseudoseizures)
       -Climbing (ladder/rope/scaffolds, never  (due to HX of pseudoseizures)
       -Balancing, frequently
       -Stooping, frequently
       -Kneeling, Crouching, Crawling–frequently
Manipulative Limitations:
       -None established
Visual Limitations:
       -None established
Communicative Limitations:
       -None established
Environmental Limitations:
       -Unlimited: Extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes,
       odors, dusts, gases, poor ventilation
       -Avoid even moderate exposure: hazards  (due to HX of pseudoseizures)
Comment:
       "Claimant states that he has trouble walking, bending, standing, squatting, stair climbing,
       kneeling and completing tasks due to back pain and side effects from seizure medicine
       and sometimes they bring seizure on. Can walk a few feet before having to stop and rest.
       Have to rest 10-15 minutes before resume walking.

Symptoms:
> **"He says he can only walk a few feet before having to stop. There is nothing wrong with his lower extremities to justify this allegation. He says he has trouble bending, standing, squatting and kneeling. Again, these allegations cannot be supported by his medical records. He is therefore considered partially credible.**

Additional Comments:
- Allegations: seizures, loses bodily function, epilepsy
- Title concurrent, AOD: 2/28/08, DLI: 3/31/10, Age 45, Education: 10th, work experience: laborer-6 months; truck driver-1988-2008
- Medication: gabapentin
- 2/29/08: CN 2-12 intact, OTE's 2/4 bilateral, S/M/C grossly intact
- **3/6/08: ct head, negative**
- 5/7/08: first seizure onset was about two years ago, has had multiple events since then..frequency has increased.
- 5/21/08: electroence phalogram, normal awake, briefly drowsy and sleep state I and II EEG
- 5/22/08: follow up neurologist appointment, improved, CN 2-12 intact OTR's 2/4 bilateral S/M/C grossly intact

## Dr. M. Mujib Rahman, Progress Notes 7/2/08 (Tr. 249-250)

7/2/08:
CC: flu seizure O/O, epilepsy
Interval History:
- has had 1- seizures since last visit, one or two long seizures, no headache, (illegible), leg swollen, (illegible)

P.M.H:
- epilepsy, migraine, depression, IPPD/ ore alcohol

Medications:
- Keppra-500 mg 1x2, Yabapentin-300mg 1x3

Motor:
Bit symmetrical

Co-Ordination:
- FNTV

Gait:
- negative

Plan:
1. Epilepsy or breakthronger, Keppra 500mg, 1x3; headache-better, anxiety-f/u 3 weeks

## Buckhannon Medical Center, Office Notes, 6/4/08-7/18/08 (Tr. 251-256)

6/4/08:
CC: wants stronger pain medication
HPI: illegible, took some of his neighbors "really helped the pain."
Review of Systems:

-Neurological: seizures
-General: alert, oriented, non-distressed, VS WNL, good eye contact
-Neck: Supple
-CVS: RRR
-**Respiratory: Clear,** BS equal Billet
-Neuro: DTR's 2/4 billet
-Back/Rectal: tenderness

Diagnosis:
-seizure disorder, chronic low back pain

Plan:
-Ibruprofen 800 g, illegible.

6/9/08:

General:
-Alert, oriented, non-distressed, VS-WNL, good eye contact

Skin: (illegible)

Diagnosis:
-(illegible)

Plan:
-procedure explained, consent obtained, (illegible), (illegible)


**Dr. Subhash Gajendragadkar, Residual Functional Capacity-9/30/08 (Tr. 257-264)**

9/30/08:

Exertional Limitations:
-Occasionally lift and/or carry (including upward pulling) 50 pounds
-Frequently lift and/or carry (including upward pulling 25 pounds
-Stand and/or walk (with normal breaks for a total of about 6 hours in an 8-hour workday
-Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday
-Push and/or pull unlimited, other than as shown for lift and/or carry

Postural Limitations:
-Frequently: balancing, stooping, kneeling, crouching, crawling
-Occasionally: climbing ramp/stairs
-Never: climbing ladder/rope/scaffolds

Manipulative Limitations
-None established

Visual Limitations
-None established

Communicative Limitations
-None established

Environmental Limitations
-Unlimited: Wetness, humidity
-Avoid concentrated exposure: Extreme cold, vibration
-Avoid even moderate exposure: extreme heat, noise, fumes, odors, dusts, gases, poor ventilation
-Avoid all exposure: hazards (machinery, heights, etc.)

Symptoms:
-**"Partially credible- e.g. 'Sometimes can walk only a few feet' –degree of self-claimed/described impairments/limitations are not supported by medical findings. He reports multiple seizures but his EEG is normal."**

Additional Comments:
-3/6/08: **CT of Head Negative**
-5/21/08: EEG normal awake, briefly drowsy and sleep stage I and II
-7/08: was last seen by Dr. Rahman in 5/08. Reported he had about 10 seizures, one or two long ones since that itme. RX: Keppra

**Dr. Adriana Palade, Progress Notes, 5/26/09-8/3/09 (Tr. 265-268)**
5/26/09 letter:
HPI:
-46 y.o., white male with a history of hypercholesterolemia, asthma, COPD and history of epilepsy for the past two years.
-Wife describes that he has sudden onset of new uncontrollable shaking of all extremities, accompanied at times by staring off in space, lasting 1-2 minutes, witnessed by her on several occasions, occurring at times, 3-4 times a day.
-Used to have bowel and bladder incontinence prior to the Keppra being started.
-Has an aura of a poorly described sensation in his chest turning inside, felt inside the chest, followed by loss of awareness.
-Complains of witnessed snoring, apnea and daytime sleepiness and a little difficulty functioning.

Past Medical History:
-medications are Keppra 500 mg twice a day, gabapentin 300 daily, Nexium, Lipitor, Advair and proventil.

Social History:
-used to work as a truck driver and does admit to **36 years, 3 packs/day smoking**. He rarely uses alcohol and denies recreational drug use.
-His neurologic examination is unremarkable. He does have a full, thick neck.

Impression & Plan:
-I suspect epilepsy based on description. I ordered an EEG today, which will be done after 2;00 and I will send the results to you ASAP. **Undoubtedly, he has sleep apnea. He will have a sleep study done tomorrow. I will consider video EEG monitoring to capture some of the spells to try to characterize them.** His other medical problems are stable, and I advised him to continue the same medications. I will try to obtain his records from your office because it may be helpful in the future.

8/3/09 letter:
-No shaking spells during Claimant's admission to epilepsy monitoring unit for entire 5 day period;
-Entire EEG for the 5-6 days of admission was normal, has had only a couple of spells since discharge despite the Keppra
-He continues to take gabapentin for his back pain, Nexium, Lipitor, Advair, Proventil

for his asthma, COPD and other medical problems.

-**he had a CT scan done according to the records which was negative**. The wife says that he had a brief spell at a McDonald's a few days ago and that may have not been accompanied by loss of consciousness. He had a sleep study and CPAP titration trial completed just approx. 7 days ago showing that he was severe obstructive sleep apnea, and **a BiPAP used at a pressure of 12 and 7 will be able to improve most of the patient's complaints and improve sleep continuity.**

-Neurologic exam is unchanged. He has a tight throat. Neck circumference was approximately 24 cm. He has a large tongue and soft palate edema.

Impression/Plan:

-I am uncertain if he has seizures or not. I am inclined to believe that he does not based on the current EEG recording and the fact that **he has severe obstructive sleep apnea for which he will need to use his BiPAP. I opted to leave him on the Keppra at a dose of 500 mg twice daily and reevaluate him in a few months, after at least three to four months of BiPAP.** His blood work is supportive of that with increased hemoglobin stable. He needs to continue home medications. I advised him against driving for one year, or engaging in any dangerous activities. I will obtain an MRI of the head prior to the next clinic visit.

**Dr. Amy Pearson, Treating Records, 3/6/08-8/3/09 (Tr. 269-314)**

3/6/08:

Reason for Exam: seizure like activity

Assessment:

-Full result: CT head, unenhanced and enhanced. Axial imaging through head without and with contrast shows no hemorrhage, mass effect, midline shift or hydrocephalus and no abnormal enhancement is seen. Visualized paranasal sinuses are clear.

Impression:

-Negative CT head

5/7/08: exam by M. Mujib Rahman

Reason for consultation:

-The patient is seen in consultation from Dr. Johnny Smith for evaluation of seizure-like activities.

HPI:

-Claimant is a 45-year old right handed male, who complains of episodes of brief shaking and jerking and confusion. The first episode was about two years ago. He had multiple episodes since then. He described the episode as briefly confused, unresponsiveness, followed by cough and shaking and jerking. It may last from seconds to a minute with postictal confusion and headache and sleep. Some of the events are associated with loss of bladder control. He does not have any history of tongue bite. He says that he can have almost everyday the episodes and he is aware of the surroundings. The frequency of the spells have increased recently. Sometimes he may have warning and he knows that the spell is coming, but he is unable to control. **He had a CT scan of the head a couple of months ago and is negative**. He complains of mild headache everyday for about one year. He described the headache as over both sides of the head and back of the head as

pressure, sometimes maybe pounding. Not associated with any nausea or vomiting or photophobia or phonophobia. He has headache almost everyday for about one year.

Review of Systems:

-He complains of dizziness and blurred vision. **He does not complain of any cardiovascular, respiratory or gastrointestinal symptoms.** He has a history of kidney stone and had surgery. He complains of seizure. The remainder of the review of systems is noncontributory.

Physical Examination:

-BP is 120/80, pulse 70, respiratory rate 20. **Skin, cardiac, chest and abdominal examination is unremarkable.** HEENT is unremarkable. Neck is supple. Neurologic examination-he is awake and oriented. Speech is fluent. Cranial nerve examination II through XII-PERRLA, extraoccular movements intact. Face is symmetrial. Tongue in the midline. Palates elevate symmetrically.

Motor examination:

-muscle tone and bulk normal. Strength is bilaterally symmetrical 5/5 both upper and lower extremities proximally and distally. Deep tendon reflexes are bilaterally active and symmetrical, 2+ biceps, triceps, brachioradialis, patella tendons and Achilles' tendon. Plantars are downgoing.

Sensory examination:

-too soft touch, position, vibration is unremarkable. Gait and coordination-finger-to-nose test normal. Gait is normal and regular.

Impression:

1. Seizure. First seizure onset about 2 years ago, has had multiple events since then. Frequence has increased. Recommend EEG to evaluate for seizure. **Appears to be complex partial seizure.**

2. Headache mixed with tension type headache and chronic daily headache for the last 1 year. Try Gabapentin 300 mg. P.o.q.h.s. for a couple of days. Increase to 1 twice a day to continue and recommend EEG to evaluate seizure.

3. History of kidney stone. He had surgery in 2001.

4. Anxiety and depression and pseudoseizure. He is for follow-up in a couple of months after EEG.


2/25/09:

CC: establish & PEP

HPI: **current smoker, 1 pack/day for 25-30 years, Complains of seizure activity.** Occurs 3x/weeks on meds and helping. Patient knows it is going to happen ear ringing. Diffuse tomc/conic activity and eye contact during activity. Incontinence at times, feels week/worn out and seizure activity "post-ictal" has slept 20 hours afterward. Saw Dr. Rahman EEG x2, complains of back and shoulder pain, is a truck driver unable to work with these seizures.

Exam:

-Constitutional: general appearance

-Eyes: conjunctive & lids, pupils & irises

-ENT: external ears & nose, EAC & Tms, nasal cavity, lips, teeth, gums, oropharynx

-Resp: Respiratory effort, auscultation CTA

-CV: Auscultation
-GI: masses, tenderness, liver & spleen, nontender + BS
-Musc: Pain ROM left shoulder, of at least one area including inspection and/or palpation, ROM and stability
-Psych: judgment & insight, mood & affect
A/P: 1. Seizures-neuro, 2. Back pain/left shoulder- xray left shoulder**; 3. Polycythemia-sleep study**; 4. Hyperlipidemia-labs; **5. Tob. Abuse-CxR CMP, CBC, Lipids, Liver test**

2/26/09:
Reason for Exam: shoulder/arm injury
Assessment:
-Left shoulder: AP views of the left shoulder in internal and external rotation were obtained as well as a scapula Y view. There is no evidence of a fracture or dislocation. The humeral head maintains proper position relative to the glenoid. The acromio-clavicular joint is intact.
Impression:
-Normal Left shoulder films

2/26/09:
Reason for Exam: **tobacco user**
Assessment:
-PA and lateral chest: **PA and lateral chest films were obtained which demonstrate clear lungs with no focal infiltrates and no pleural effusions.** The cardiomediastinal silhouette is within normal limits for size and contour and the visualized bones are normal.
Impression:
-Normal PA and lateral chest films
3/11/09:
CC: Presents for f/u on xrays & BW. The new pain pill doesn't help
HPI: **current smoker, 1 pack/day for 25-30 years, f/u shoulder pain xrays negative.** Complains of pain in hips wakes at night, now pain both shoulders and believes it is an (illegible), Having diff. Breathing. Continues to have sz activity OD patient and it really sz if coughs has episode. Relief & (illegible.) Has chest pain/SOB.
Exam:
-Constitutional: genera appearance
-Eyes: conjuctive & lids, pupils & Irises
-ENT: External ears & nose, EAC & Tms, nasal cavity, lips, teeth, gums, oropharynx
-Neck: Thyroid
-Resp: Auscultation, coarse rhonchi/wheezing
-CV: auscultation, carotids, edema &/or varicosities
-GI: Masses, tenderness, liver & spleen
-Lymph: neck
-Musc: Gait & station
-Neuro: cranial nerves, strength and tone, reflexes, sensation

-Psych: mood & affect

A/P: Spirometry-obstructive pattern, 1. Polycythemia: sleep study, 2. Sz activity: neuro, 3. Hyperlipidemia, increase Lipitor 20mg OD, 4. Chest pain EKG/MPS, 5. SOB, prov HFA, Advair 250/50

3/18/09:

Procedure: Adenosine infusion with myocardial imaging

Reason for Procedure: CP, NM Myocard Eject fract Gated

Assessment:

The patient was given 10 miCI of Cardiolite at rest and during the Adenosine infusion, was given 30 miCi of Cardiolite. Both images were compared. The patient had good distribution of the Cardiolite throughout the myocardium without significant area of fixed or reversible defect. **The gated scan was done and showed normal left ventricular systolic function; normal ejection fraction of 52%.**

Conclusion:

Negative Myocardial perfusion scan for ischemia; normal ejection fraction of 52% and normal left ventricular function.

3/25/09:

CC: 2 week flu, Mcrs (illegible)

HPI: **current smoker, 2 packs/day**, Flu, had stress test, abnormal, sees Dr. (Illegible) Friday, **stress results returned negative**, flue sab, less episodes some last night. Still SOB, seem like going to start and happen, patient aware just can't stop or focus or respond to family, sometimes falls down, feels SOB and energy, sleeps all the time.; pain in left shoulder

Exam

-Constitutional: general appearance

-Eyes: conjuctive & lids, pupils and Irises

-ENT: external ears and nose, EAC & Tms, nasal cavity, lips, teeth, gums, oropharynx

-Resp: Respiratory Effort, auscultation, wheezing

-GI: Masses, tenderness, liver & spleen

-Musc: inspection &/or palpation, ROM, stability, left shoulder sore

-Neuro: cranial nerves, strength and tone, reflexes

-Psyc: mood & affect

A/P: Reviewed stress test results, 1. SOB, 2. Prob. Sleep apnea/polycetheimia, 3. Hyperlipidemia, 4. Seizure activity, 5. Left shoulder/pain, x-rays n/MRI

4/8/09:

CC: bad sore throat x5 days

HPI: c/o st x 5days, 0F, 0RN some bilat ear discomfort, some (illegible) 1 had today, hurts to sneeze, constantly feels something stuck in throat, +HPI

Exam

-Constitutional: general appearance

-Eyes: conjuctive & lids, pupils & Irises

-ENT: external ears & nose, EAC & Tms, Nasal Cavity, Lips, teeth, gums, oropharynx,

erythemal edma
-GI: Masses, tenderness, liver & spleen
Assessment/Plan: Strep(-), pharyngitis: prob. Return, omeprazole 20 mg OD

5/18/09:
CC: presents c/o cold symptoms, cold, congestion, increased in seizure activity since mothers day. Was better, but since "cold" seizures are back.
HPI: complains of cold symptoms, increased seizure activity for 1 week. Patient feels episode coming on. Has had 6 in past week. Has upper body tremor and blank stare falls forward or backward-last secs only. Sometimes bladder incontinence. Wheezing and coed, sleep study on 20 Flooding RLS 6/1109.
Exam
        -Constitutional: general appearance
        -Eyes: Conjuctive & lids, pupils & Irises
        -Resp: respiratory effort, auscultation, wheezing, increased air (illegible)
        -CV: auscultation
        Neuro: cranial nerves, strength & tone, reflexes, sensation
Assessment/Plan: Reviewed pk flow/ O2 sat.; bronchitis: augmentin 845 BID x 10D; S2 D/O:
        flue neuro as sch.

5/27/09:
CC: Follow up, **current smoker**
HPI: flu bronchitis, (illegible), increased seizure activity. On augmontin, feels some better, **less SOB, still some in PM,** Zero seizure like activity since last visit, Saw neuro yesterday, had EEG and sleep study tonight, rec hospital for observation.
        -Eyes: conjuctive & lids, pupils & irises
        -ENT: external ears and nose, EAC & Tms, nasal Cavity
        -Resp: auscultation, exP, wheezing, complete resolution
        -CV: auscultation
        -GI: Masses, tenderness, liver & spleen
Assessment/Plan:
        -Bronchitis, bronchospasm, **COPD, tobacco abuse cessation**

6/30/09:
CC: presents for follow up from hospital, worried about heartbeat
HPI: follow up released from hospital yesterday for seizures, denies seizure symptoms since release. Dr. Paletic to follow up with sleep apnea July 5th or 7th.
        -Resp: Respiratory effort, auscultation
        -CV: auscultation, pedal pulses, edema
        -Neuro: cranial nerves, reflexes
Assessment/Plan:
        -Follow up hospitalization, improved, **talked to about quitting smoking**
        -seizures, continue current medications and follow up with (illegible)
        -Hotter monotop?

7/3/09:
Indication: SOB
Medications: advair, proventil, lipitor, keppra, neurontin
Assessment:
- Claimant was monitored for 24:00 hours; 24:00 hours were analyzed. During this time his average heart rate (HR) was 79, with a min. HR of 51 at 8:59:48 am and a max HR of 103 at 6:42:11pm. He had 1 pauses greater than 2.5 sec. The longest pause was 61.044 sec. At 11:42 pm. There were 114430 total beats.
- Claimant's test showed 192 VPB's. He had 145 isolated VPB's, 19 VPB pairs, and 2 VPB runs. 6 beats were in VPB runs. The longest run had 3 beats at 2:23:08 am and the fastest run had a rate of 159 at 12:49:35 pm.
- Claim's test showed a 1 bigminy events with 3 bigeminy beats, 0 trigeminy events with 0 trigeminy beats, and 0 quadrigeminy events with 0 quadrigeminy beats. There were 6 RonT beats.
- Claimant's test showed 201 SVPB's (20% prematurity), 15 SVPB pairs, and 17 SVPB runs. The longest run had 13 beats at 1:14:26 am and the fastest run had a rate of 88 at 11:43:27 pm. There were 0 aberrant SVPB's.
Comments:
- sinus rhythm, no hg. (Illegible), no (illegible), No pause., ok all.


8/4/09:
CC: presents for F/U visit
HPI: follow up hotter, WNC, breathing excessively in PM using Proventil MP 2-3x/evening. Had seizure activity 2 weeks ago, saw neino Dr. Pilate believes problem is decreased oxygen not epilepsy
Diagnosis:
- severe obstructive sleep apnea, has had SPAP study 12/7, no machine yet, patient felt good the next day.
Assessment/Plan:
- **Sleep apnea, await CPAP**, Hypoxia, hyperpidemia, v tabs, back pain, naprosign 500 bid, CBC, CMP, Lipids, Liver

**Dr. Amy Pearson, Report Results, 2/25/09-11/3/09 (Tr. 315-337)**
3/18/09-Diagnostic Imaging Report
NM Myocard Rest & Stress
Reason for Procedure: CP, NM myocard Eject Fract gated
Assessment:
- Patient was given 10 mCi of Cardiolite at rest and during the Adenosine infusion, was given 30 mCi of Cardiolite. Both images were compared. The patient had good distribution of the Cardiolite throughout the myocardium without significant area of fixed or reversible defect. **The gated scan was done and showed normal left ventricular systolic function; normal ejection fraction of 52%.**
Conclusion:

-1. Negative Myocardial perfusion scan for ischemia; 2. Normal Ejection fraction of 52% and normal left ventricular function.

3/18/09-Adenosine Infusion with Myocardial Imaging

Rest EKG: Normal sinus rhythm, 76/min., nonspecific T wave abnormality. Prolonged QT. Abnormal EKG

Adenosine Infusion:

-Symptoms: short of breath, no chest pain.

-Arrhythmia: none

-EKG: NO EKG changes

Interpretation:

-Negative EKG test with Adenosine infusion

Comment:

-nuclear images to follow


7/3/09-Holter Report by Rozinn Electronics Inc.

Indications: SOB

Medications: Advair, proventil, lipitor, keppra, neurontin

Assessment:

-Claimant was monitored for 24:00 hours; 24:00 hours were analyzed. During this time his average heart rate (HR) was 79, with a min. HR of 51 at 8:59:48 am and a max HR of 103 at 6:42:11pm. He had 1 pauses greater than 2.5 sec. The longest pause was 61.044 sec. At 11:42 pm. There were 114430 total beats.

-Claimant's test showed 192 VPB's. He had 145 isolated VPB's, 19 VPB pairs, and 2 VPB runs. 6 beats were in VPB runs. The longest run had 3 beats at 2:23:08 am and the fastest run had a rate of 159 at 12:49:35 pm.

-Claim's test showed a 1 bigiminy events with 3 bigeminy beats, 0 trigeminy events with 0 trigeminy beats, and 0 quadrigeminy events with 0 quadrigeminy beats. There were 6 RonT beats.

-Claimant's test showed 201 SVPB's (20% prematurity), 15 SVPB pairs, and 17 SVPB runs. The longest run had 13 beats at 1:14:26 am and the fastest run had a rate of 88 at 11:43:27 pm. There were 0 aberrant SVPB's.

Comments:

-sinus rhythm, no hg. (Illegible), no (illegible), No pause., ok all.


11/3/09-St. Joseph's Hospital Lab Report

Test: Blood Gas Arterial

-Results called to Lori at Dr. Pearson Office

-**No, PaO2 has to be below 55 to qualify**

-Let patient know does not qualify but O2 levels are low

-Schedule overnight study, **patient does qualify for home O2**.


11/8/09-Instant Diagnostic Systems, Inc. Lab Report

Pulse Oximetry Test Report Results

-Oximetry test results suggest the patient may fall under Medicare Group 1 Criteria

because of an arterial oxygen saturation at or below 88% for at least 5 minutes taken during sleep.

-There were 23 total desaturation events recorded during this test. 23 desaturation events lasted 3 mintues or less, with a cumulative time of :14:28, 0 desaturation events lasted over 3 minutes for a total time of 00:00:00, in 20 desaturation events the Spo2 fell to 88% or below.

-Average event duration: 37.739 seconds, desaturation event index (avg. events per hour): 3.248, mean onset Spo2 (avg high Spo2 of all events): 92.174, Mean low Spo2 (avg low Sp02 of all events): 85.478

**Pearson Family Medicine, Letter-11/12/09 (Tr. 338-339)**

-"Claimant is a patient who presented to our office on February 25, 2009 with concerns of seizure activity. Claimant had been experiencing episodes of ear ringing, diffuse clonic/tonic muscle activity and incontinence since the summer of 2008. The patient had been evaluated by a neurologist and tested with EEG's on two different occasions without diagnosis or symptom relief. The patient had been told not to drive and therefore had been unable to work at his customary occupation as a truck driver as a result. Review of records presented by Claimant from the initial neurology **work-up revealed polycythemia and symptoms of sleep apnea** including daytime somnolence. A sleep study was arranged, as the patient had several symptoms of sleep apnea and **I felt that the patient could be experiencing significant oxygen desaturation contributing to his seizure like activity.**

-"Claimant had regular office visits and to complete a thorough work-up a cardiac etiology was ruled out by evaluation by a cardiologist and stress testing performed. **The patient has continued to have these episodes despite discovering that in fact he does have sleep apnea and is wearing CPAP at night to decrease nighttime apnea and daytime somnolence**. The patient continues to feel tired and suffer from shortness of breath. Pulmonary Function Testing has revealed severe Chronic Obstructive Pulmonary Disease and a low forced vital capacity. Recent Arterial Blood Gases demonstrated PaO2 of 61% and overnight oximetry studies with CPAP demonstrated that the patient's oxygen saturation was less than 88% for 16.9% of the time the oximeter was in place. The patient therefore meets standard criteria for home oxygen at night as well as the CPAP.

-"Claimant's combined diagnoses severely impair Claimant's ability to drive and work safely. The pseudo-seizures are a result of the combined problems leading to marked decrease in the patient's ability to oxygenate his body. It is my medical recommendation that the patient avoid driving and attempting to work."

D.     Testimonial Evidence

Testimony was taken at the hearing held on November 16, 2009.  The following portions

of the testimony are relevant to the disposition of the case:

(The Claimant, KENNETH PAUL MYERS, having been first duly sworn, testifies as follows:)

EXAMINATION OF CLAIMANT BY ADMINSTRATIVE LAW JUDGE:

Q      Is Kenneth Myers you name, sir?
A      Yes, Ma'am.
Q      Is your birth date 4-13-63?
A      Yes, Ma'am.
Q      Finished the 10th grade?
A      Yes, ma'am.
Q      You worked as a laborer in a sawmill and a trucker for, well, a trucker since 1988. Is that correct?
A      Yes, ma'am.

                    *                    *                    *

Q      Okay, how tall are you, sir, about?
A      My guess would be about 5'6", 5'7". I'm not really sure without proper measuring.
Q      How much do you weigh?
A      285.
Q      And you're married?
A      Yes.
Q      Live with your wife?
A      Yes.
Q      Any small children?
A      I have two children, Your Honor, 16 and 21.
Q      All right, who would resent being called small children. Do you have a driver's license?
A      Yes, Ma'am.
Q      You're unable to drive right now?
A      Yes, ma'am. I have CDLs.
Q      Do you read and write?
A      Yes, ma'am.
Q      Are you left or right-handed?
A      Right-handed
Q      Do you smoke?
A      Yes, Ma'am.
Q      About how much?
A      A pack a day, which I am working to try to change that.
Q      I would hope so. Do you drink?
A      No, ma'am.
Q      Use any drugs without a doctor's prescription?
A      No, ma'am.
Q      Do you have any source of income right now?
A      No, ma'am.
Q      Do you have any insurance or medical card?
A      I have a medical card.

Q       Your worked as a trucker. Tell us what your duties were as a trucker.

A       Long haul, cross-country, flatbed pulling various freight, lumbar and such as.

Q       How much was the heaviest amount that you had to lift in weight on a regular basis?

A       On a regular basis probably about 200 pounds with our tarps that we put on and off of the loads which each roll of tarp was about 100 pounds apiece.

Q       How long did you do that type of work?

A       Since 1988.

Q       Have you been working since February of 2008?

A       No.

Q       Are you able to shower and take care of your hair?

A       I'd like to say that I can but it proves to be difficult sometimes. I get pretty short-winded and tired even taking a shower.

Q       What's the problem with wearing your machine at night?

A       I knock it off in my sleep mostly. I mean I go to bed, I put it on, I fall asleep and I wake up and it's laying beside the bed, the machine is running. Whether I unconsciously knock it off or pull it off I'm not sure.

Q       How long have you been using it?

A       I would have to look at the records, Your Honor, to see the date which they gave me the machine.

Q       Do you remember the month not necessarily, just the day?

A       I think I'm going on my second month of having it.

Q       This is your second month?

A       Yes, I believe.

Q       Okay, they did the sleep study, well at least Dr. Palade felt that it was a sleep problem back in August. Profusion, chest x-ray. So you think it's about two months since they got you hooked up?

A       Yes, to the best of my what I can remember. Like I said, I'm not quite positive about the date because they have a card in those machines for the insurance companies–

Q       yes.

A       – and once a month they come and they take the card to download the information off of it to give to the insurance companies to see how much you've actually been wearing it. Because if you don't wear it enough then the insurance companies don't want to cover it but they tell me it's not unusual for people to have trouble wearing them.

Q       Okay. Have you ever had a seizure where you had to go to the hospital because of some injury to yourself?

A       I have had a couple where I could have but did not go because no insurance of anything but I've fallen and hit my head before. I've had one in my restroom one time where I pretty much took out a stand with my head and was –

Q       What about, I'm sorry.

A       My wife had to pick me up out of the floor.

Q       What about since you've had your BiPAP machine?

A       **No, none since then, none that serious**. (emphasis added).
Q       Are you able to help with the chores around the house?
A       To a point. I mean not normally like any, I mean I get started doing things and then I tire and have to rest to come back to it and finish them.
Q       Okay, how long can you stand without sitting or sit without standing?
A       It varies. Sometimes shorter, sometimes longer, just –
Q       Well, on the average?
A       Probably either one probably about 15 to 20 minutes each one maybe.
Q       Do you have any difficulty walking?
A       Somewhat sometimes things are a little, you know, might misstep or something.
Q       How far can you walk?
A       A hundred yards.
Q       Do you have any hobbies that help pass the time?
A       Not really, Your Honor. Little model building.
Q       Model building airplanes or cars or –
A       Airplanes.
Q       Do you help or do any grocery shopping or personal shopping for yourself?
A       No.
Q       Do you help with the cleaning?
A       No.
Q       Doing laundry?
A       No.
Q       Any vaccumming or sweeping?
A       No, ma'am.
Q       Any cooking?
A       Very little.
Q       How little?
A       I can make myself a sandwich or a bowl of cereal.
Q       Okay, do you visit with family or friends?
A       My sick father.
Q       Where does he live?
A       Two miles from my home in Tennerton which is a suburb you might say of Buckhannon.
Q       Do you have any activities outside the home such as clubs or church or anything like that?
A       No, ma'am.
Q       What do you do around the house?
A       At the risk of sounding like a smart aleck, I just kind of sit around and take it easy. Mostly I'm kind of following doctors' orders since all this come up. You know, they told me to take it easy and my family pretty much takes up the slack because they're afraid that, you know, I might have an episode and fall or something.
Q       So you don't do anything around the house?
A       Pretty much.

| Q | Okay, do you have any side effects from any of your medication? |
|---|---|
| A | Yeah, the medicine that they have me on, the seizure medicine that they have me on of course it dehydrates some. |
| Q | Okay. |
| A | And, you know, makes you tired. |
| Q | All right, Mr. Miller. |
| Atty | Thank you, Your Honor. |

EXAMINATION OF CLAIMANT BY ATTORNEY:

| Q | Mr. Myers, you heard me talking with the Judge earlier about seizures and oxygen desaturation. As we sit here today, do you believe that you have a seizure disorder? |
|---|---|
| A | **No, I don't. Not anymore**. (Emphasis added). |
| Q | What problem do you think you have? |
| A | I think it's the oxygen deprivation. |
| Q | Did you at one time think you had a seizure disorder? |
| A | Yes, I did. |
| Q | Now, you were talking with the Judge, you said you have a driver's license? |
| A | Yes. |
| Q | Do you drive now? |
| A | No, I have not been. |
| Q | How long has it been since you think, do you think since you've driven? |
| A | Probably since the middle of February. |
| Q | Of 2009? |
| A | Yes. |
| Q | And why, did the doctor limit you or did you limit yourself? |
| A | Well, I limited myself at first for safety reasons and then the doctors put me on the medicine and told me it would be wise not to do so. |
| Q | You were driving a truck. Were you having any trouble when you were still driving? |
| A | Yes, I had occasional episodes going down the highway and felt that it was unsafe for the public for me to be out there and it, at first I overlooked it, thought it was something that might go away or whatever and, you know, because I had to make a living but then once I felt that it was, like I said, too unsafe for the public as well as myself I decided to go to physicians to have it looked at– |
| Q | Tell – |
| A | –and was diagnosed– |
| Q | Okay. |
| A | –was diagnosed in that way and– |
| Q | Now at that time they diagnosed you with seizures? |
| A | Yes. |
| Q | When you say episodes while you're driving, what kind of episodes were you having? |
| A | Hands trembling and shaking and jerking and my legs and just getting disoriented |

and dizzy and–

Q      Were you having any problems, I mean aside from those type of episodes were you having any problems with sleepiness, drowsiness, back at that time?

A      Yes, I would, as time progressed it got worse. I could be home when I was supposed to be there resting and rest for five, six, seven hours and get in my truck and I should have been good for 10 hours of work and I'd go maybe a couple hours down the road and have to pull over and sleep for, you know, an hour or two to continue when I should've been able to go.

Q      Did you actually have a route where your supervisor was seeing you pulled over on the road?

A      Occasionally, yes. We both did the same job and would go to the same places and I'd leave before he would and he'd come along and wondered why I was on the side of the road resting and –

Q      So, eventually you ended up at WVU–

A      Yeah.

Q      –there having some testing done. It looks like at first they were looking for seizures. Is that right?

A      Yes.

Q      But you had a sleep study done?

A      Yes.

Q      And they diagnosed sleep apnea?

A      Yes, I had two of them.

Q      What, you had one without the BiPAP and then one probably with the BiPAP, is that right?

A      Yes.

Q      Okay. Now, when they talk about sleep apnea what problems are you having? I mean what are you experiencing?

A      I just, like I'm breathing but I'm not getting any air, not just, I can't explain it how the sensation is. It's almost like you're breathing but there's no oxygen in the air you might say.

Q      Now, prior to getting you BiPAP did you sleep well at night?

A      No.

Q      Your wife ever tell you, you know, you stop, you're snoring real loud or you stop breathing?

A      Yeah. I eventually even got to where I would sleep in another room so that they could get rest because I made a lot of noise and tossed and turned and wake up the next morning and the bottom sheet would be on top and the top sheet would be on the floor.

Q      Just thrashing around at night?

A      Yeah.

Q      Now back at that time when you got up in the morning did you feel rested?

A      No.

Q      Did you ever have any trouble with falling asleep during the day?

A      Yeah.

| | |
|---|---|
| Q | What kind of problems did you have? |
| A | Did I have any problems? No, I didn't have any problems falling asleep. I was meaning it was a problem that I would fall asleep. |
| Q | I don't quite understand what you mean. |
| A | Well, I meant like if I'm trying to stay up to do something I would get sleepy and that was the problem. |
| Q | Okay. |
| A | I would get tired and have to sleep. |
| Q | Okay. Now, so eventually you got up to WVU and you got with Dr. Pearson and they started finding out t hat htis problem with oxygen desaturation. You now have a BiPAP? |
| A | Yes. |
| Q | Has anything been added to your BiPAP machine recently? |
| A | Oxygen. |
| Q | Was that on, was that part of your treatment originally when you got the BiPAP? |
| A | No. |
| Q | So, as you're here today with the use of the BiPAP with the addition of the oxygen, can you tell us what problems are you having now? |
| A | Excuse me. Yeah, I'm just short-winded, short of breath, tired, exhausted all the time. |
| Q | Do you ever fall asleep during the day now? |
| A | Yes. |
| Q | How often does that happen? |
| A | At least once or twice a day. |
| Q | Okay. Do you ever fall asleep while you're watching TV? |
| A | I fall asleep, yes. |
| Q | What about when you're on the phone? |
| A | Yes, I have. |
| Q | Have you ever fallen asleep when you're, say, talking with your wife or talking to somebody? |
| A | Yes. |
| Q | How often do those kind of things happen? |
| A | I don't know how to put it. A couple of times. Not, not – |
| Q | Well, just estimate. |
| A | Probably about three times. |
| Q | A day or a week or– |
| A | Falling asleep when I'm talking to somebody or something maybe once or twice a week. |
| Q | Now, if – |
| A | Sometimes not at all. |
| Q | You are using, apparently you're trying to use the BiPAP now? |
| A | Yes, I've gone to, they've even given me a strap now which goes around my head and under my jaw to, that way if I'm just batting it with my hand at night to knock it off to help hold it on and– |

| Q | But you're putting it on every night– |
|---|---|
| A | Yes. |
| Q | –before you go to bed? |
| A | Yes. |
| Q | When you wake up in the morning, how many mornings say out of a seven-day week is it still on? |
| A | None. |
| Q | None? |
| A | None yet. |
| Q | Okay, so – |
| A | I've, I've gotten up and woke up in the middle of the night periodically and realize that it's off and maybe go get something to drink or go to the restroom and then come back to bed and put it back on but then when I'd wake back up in the morning it would be off again. |
| Q | You indicated earlier that you could walk 100 yards. If you walked 100 yards would you ahve any difficulty with that? |
| A | I'd be very short-winded and have to rest before I do it again. |
| Q | When you exert yourself does that cause you any shortness of breath? |
| A | Yes. |
| Q | If you were in a job even if it was a sit-down job in an air-conditioned building would that cause you, would you have any problems with that type of job? |
| A | Probably so when I get in the porr conditions and just, you know, it helps with making you sleepy. |
| Q | Would you fall asleep during the day? |
| A | More than likely, yes. |
| Q | If I was an employer and I was paying you for eight hours in a day would I get eight hours of work out of you? |
| A | I don't think so. |
| Q | Why not? |
| A | Because I would be lagging in my work from being tired all the time. |
| Q | When you fall asleep during hte day is that on a certain schedule or does it just happen? |
| A | No, it just, it just happens. There's no, no certain time. Just it depends on how– |
| Q | The Judge– |
| A | I'm sorry. |
| Q | No, go right ahead. |
| A | It depends on how much, you know, I might exert myself or what have you, you know. |
| Q | The Judge was asking you some questions earlier about things you do around the house. Do you ever try to help your wife with things like dishes or any of those things like cleaning or that sort of thing? |
| A | Yeah, occasionally I've tried to help out but then I just, you know, maybe if I try to help do the dishes I'd, you know, get part-way through with them or something and I'd just get tired and go sit down and then they'd just take over and finish |

them.

Q    Mr. Myers, how much did you smoke in the past?

A    I've always smoked about a pack a day or since probably I would say about 1981, '82.

Q    Now that you determined, found out this is an oxygen problem what are you trying to do to reduce your smoking?

A    Well, I've tried patches and got these from the hospital up here, got these, I don't know what they're called but little white things they look like a cigar end and they have a nicotine thing that goes inside of them and then you puff on them like they're a cigarette and there's no smoke or no fire or anything but it puts nicotine in you and helps you get through and then you slowly work your way off of it.

Q    Do you intend to quit?

A    Yes. I, for the record, I have a father right now who is dying of lung cancer and in pretty bad shape and I've seen what it's done and I'm hoping not to end up down the same path.

Q    Okay, now you said earlier that you visit your father. Is that the same, same father I assume?

A    Yes.

Q    Now, do you do anything when you go over there?

A    Just, no, just go over and sit and talk maybe to him.

Q    Okay.

A    Visit.

Q    Do you drive to his house?

A    No, my wife takes me.

                *                    *                    *


(RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:)

Q    All right, does Mrs. Myers work?

A    No, Your Honor. She's, she's scheduled for knee surgery this Friday.

Q    What doctors do you see on a regular basis?

A    Amy Pearson.

Q    Ms. Pearson, Dr. Pearson rather.

A    And they've been having me see the neurologist, I mean –

Atty:    Palade?

Clmt    Palade.

ALJ    Palade?

A    Palade. Yes, Dr. Palade here in Morgantown.

Q    How often have you seen Dr. Palade?

A    I think I've seen her like three times.

Q    How often do you see Dr. Pearson?

A    She usually has me in, she's been having me in once or twice, about once or twice a month here and –

Q    All right.

A    –depending on, you know, she'll maybe have me do a test and she'll have me

25

come in for a follow-up to tell me how the testing went or something like that.

ALJ    Sure. All right. Okay, I will ask a few questions of Mr. Bell if there's nothing more that you have to tell us.

Clmt    No, ma'am, that's –

(The vocational expert, LARRY BELL, having been first duly sworn, testifies as follows:)
EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q    Mr. Bell, did you review this file?

A    Yes, Your Honor.

Q    And are your credentials accurately stated in the file?

A    They are.

Q    Did you discuss this case with anyone?

A    I did not.

Q    And are you familiar with the Dictionary of Occupational Titles?

A    Yes, Your Honor.

Q    Would you briefly explain to the claimant what that reference book is and how you utilize it and the region you're going to use?

A    Yes. The Dictionary of Occupational Titles is a reference work that's been compiled by the United States Department of Labor. It classifies jobs in the national economy. It talks about the educational requirements, the physical demands, and the different tasks you must be able to complete in order to do the job successfully. The region we're using today is West Virginia, eastern Ohio, western Maryland, and western Pennsylvania.

Q    All right, would you classify the Claimant's prior relevant work?

A    Yes. His work as a laborer in the sawmill would be heavy and unskilled and his truck driving would be medium and semi-skilled.

Q    All right, if you would take a hypothetical person of the claimant's age, education, background, and work experience who can do a range of light work; no climbing or ropes, ladders, scaffolds or anything of that nature; needs to avoid hazards such as dangerous moving machinery and unprotected heights; should avoid extremes of temperature, both heat and cold; needs a sit/stand option; and that's about it. Could that hypothetical person perform the claimant's prior relevant work?

A    No, Your Honor.

Q    Are there any occupations in the economy at the light or sedentary level that such a hypothetical person could perform?

A    Yeah, I had one quick question, Your Honor. What was the claimant's educational level?

ALJ:    I'm sorry. Mr. Myers, you finished the 10th grade?

Clmt:    I went to, I don't think I finished the 10th grade. I think 9th was the, I quit my 10th grade year.

ALJ:    Okay.

Clmt: I was thinking about that after he asked me that. I'm sorry.
ALJ: That's all right.
Clmt: I do not believe that I actually graduated the 10th grade. I know I did the 9th.
ALJ: Okay, so–
Clmt: I'm pretty positive I quit in my 10th year.
ALJ: All right, so nine years of education.
VE: Okay, and no GED?
ALJ: No GED?
Clmt: No, ma'am.
ALJ: You have no GED, sir?
Clmt: No, ma'am.

BY ADMINISTRATIVE LAW JUDGE:
Q    Okay.
A    Okay, at the light level that hypothetical individual I believe could function as a hand packer; 196,000 nationally, 1,900 regionally. And also at the light level a laundry folder, light, 50,000 nationally, 650 regionally. The hand packer DOT, did I give you that?
Q    No.
A    920.687-166. For laundry folder, excuse me, 369.687-018.
Q    And at the sedentary level?
A    Sedentary level, machine tender, sedentary, 141,000 nationally, 1,400 regionally, and an exemplary DOT would be 690.686-066; or general sorter, 50,000 nationally, 550 regionally, exemplary DOT 734.687-101.
Q    All right, if a person were to be off task in this job for any reason whatsoever how much time off task would be tolerated generally?
A    Somewhere up to 9 percent depending on the location but once you hit double digits if the person is going to miss, be off task 10 percent or more of the time then I believe that eliminates a competitive work routine at any level, Your Honor.
Q    And in this context what do you mean by a sit/stand option?
A    That would be like if you were standing you would be able to sit for a few moments but continue to be on task and you could alternate that throughout the day but you, at the light level it wouldn't take you, you would be standing at least six of eight hours.
Q    All right, and is your testimony consistent with the Dictionary of Occupational Titles?
A    I believe it is, Your Honor.
ALJ: Mr. Miller, questions of Mr. Bell?
Atty: Yes, Your Honor.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:
Q    Mr. Bell, in the type of work that you've discussed here today, is there any allowance for sleeping on the job outside of the normal breaks and lunch period?

27

| | |
|---|---|
| A | No. |
| Atty | Your Honor, I have no other questions. |
| ALJ: | All right, if there's nothing further then the hearing will be closed and thank you both very much. |

E.      Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and

through medical records.  The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life:

- highest grade of school competed: 10th grade (Tr. 173)
- holds CDL driver's license (Tr. 174)
- able to visit sick father (Tr. 176)
- able to feed and water pets (Tr. 177)
- has no problem with personal care (Tr. 177)
- Prepares cereal, sandwiches, hamburgers and hot dogs on a daily basis (Tr. 178)
- Does not do household chores since illness (Tr. 178)
- Occasionally goes outside (Tr. 179)
- Unable to drive (Tr. 179)
- Is able to count change, handle a savings account, use checkbook (Tr. 179)
- Seldom goes shopping, if goes, goes for food & household necessities (Tr. 179)
- Watches TV daily (Tr. 180)
- Spends time interacting with family on a daily basis (Tr. 180)
- Can only walk a few feet before needing to stop and rest (Tr. 181)
- Follows written instructions OK (Tr. 181)
- Has not been fired or laid off from a job because problems getting along with others (Tr. 182)
- Does not use any ambulatory devices to aid in walking (Tr. 182)
- Does not go many places because of seizures (Tr. 183)
- Sometimes has loss of bodily functions resulting (Tr. 183)
- Afraid to go outside for fear of seizures and causing a scene (Tr. 183)
- Handles stress ok (Tr. 181)
- Numerous references in record to Claimant's obesity
- Numerous references of Claimant's continued smoking habit

### III.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant contends the ALJ's decision is not supported by substantial evidence because

the record "actually showed just the opposite" that Claimant's condition had not been successfully treated. See Pl.'s Mot. for Summ. J., pg. 5 (Dkt. 10). Claimant argues the ALJ committed an error of law by ignoring relevant evidence that would have supported Claimant's position because the "actual objective testing results are directly contrary to the ALJ's finding of improvement." Id. at 6. Claimant also argues the ALJ's decision was in error because the ALJ failed to consider relevant pulmonary function testing results in her determination. Claimant concedes, however, the pulmonary function testing at issue were deficient because the results did not follow the "administration of a bronchodilator" as required. Id. at 9-10. Claimant contends the ALJ committed an additional error of law because the ALJ found Claimant had not followed prescribed medical treatment but did not follow the required legal analysis. Id. at 11. Claimant's fourth argument is that the ALJ failed to include all of Claimant's limitations in the residual functioning capacity (hereinafter "RFC") finding.

Commissioner asserts Claimant's first three arguments are "essentially an objection to the ALJ's RFC assessment." See Cmm'r Summ. J., pg. 9 (Dkt. 9). In opposition, Commissioner argues the ALJ assessed Claimant's RFC in accordance with the regulations and supported her assessment with substantial evidence. Specifically, Commissioner contends the ALJ "explicitly accommodated any credible limitations in functioning reasonably established in the record" and not based upon the ALJ's own medical expertise. Id. at 9. Commissioner also argues the ALJ did not ignore the pulmonary testing results but properly declined to give them any significant weight. Id. at 11. Commissioner rebuts Claimant's allegation that the ALJ's determination was based on "failure to follow prescribed treatment" grounds by arguing the ALJ observed Claimant's medical record showed that the standard course of prescribed treatment was expected

to control Claimant's daytime sleep apnea and Claimant failed to rebut this. Lastly, Commissioner cites to the transcript of the administrative hearing to establish that the ALJ did include all of Claimant's established and credible limitations in the hypothetical posed to the Vocational Expert (hereinafter "VE").

In his Response to Commissioner's Motion for Summary Judgment, Claimant reiterates his arguments that the ALJ's conclusions that Claimant's "sleep apnea condition had been and could be successfully treated," and that Claimant "had not followed prescribed treatment" are not supported by the substantial evidence of record. <u>See</u> Pl.'s Response, pg. 2 (Dkt. 13). Claimant argues the ALJ improperly concluded the pulmonary function testing results were not "worthy of interpretation" because an "ALJ is not qualified to interpret raw medical testing results." <u>Id.</u> at 6. Additionally, Claimant argues the ALJ "unquestionably used the issue of failure to follow medical advice as a basis for the unfavorable decision" when "[t]here is no issue of failure to follow medical advice in this case." <u>Id.</u> at 8-9. Claimant contends, even if such issue existed, the ALJ failed to follow the required legal analysis. Lastly, Claimant argues the ALJ's RFC finding makes no mention of falling asleep during the day. Claimant contends the "ALJ should have determined how often and for how long [Claimant] was falling asleep during the day," and then "included that limitation in the RFC finding." <u>Id.</u> at 10-11.

B.    <u>Discussion</u>

1.    **Whether Substantial Evidence Supports the ALJ's Determination**

Claimant argues the ALJ committed an error of law and that the ALJ's decision is not supported by substantial evidence because the ALJ "erroneously found Claimant's sleep apnea condition had been and could be successfully treated." <u>See</u> Pl.'s Mot. for Summ. J., pg. 5 (Dkt.

10).  Claimant contends the ALJ's decision was based on the conclusion that Claimant's condition had been successfully treated.  Claimant argues the ALJ substituted her own medical opinion in finding Claimant's condition had improved, which was exactly opposite to the actual objective testing results.  Claimant also argues the ALJ failed to consider relevant pulmonary function testing results.  Additionally, Claimant contends the ALJ's decision was based on a finding that Claimant had not followed prescribed medical treatment, but that the ALJ failed to follow the required legal analysis.

Commissioner argues Claimant's arguments are "essentially an objection to the ALJ's RFC assessment." See Cmm'r. Mot. for Summ. J., pg. 9 (Dkt. 12).  Commissioner contends the ALJ "explicitly accommodated any credible limitations in functioning reasonably established in the record." Id.  Moreover, Commissioner argues the ALJ did not rely on her own medical opinion but cited to Claimant's medical record for support in the ALJ's decision.  Additionally, Commissioner asserts that the ALJ did not decide the case on "failure to follow prescribed treatment" grounds but instead on the proper assessment of Claimant's "RFC in accordance with the mandated regulatory factors by comparing [Claimant's] allegation of disabling fatigue and shortness of breath with the record as a whole." Id. at 12.

"The role of the District Court is to address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the 'substantial evidence inquiry.'" Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998).  The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).  Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a

medically determinable impairment that could cause the symptoms alleged.  <u>Id.</u> at 594.  The ALJ

must next "expressly consider" whether a claimant has such an impairment."  <u>Id.</u> at 596.  If the

claimant makes this showing, the ALJ must consider all evidence, including the claimant's

statements about his symptoms, in determining whether the claimant is disabled.  <u>Id.</u> at 595.

While the ALJ must consider the claimant's statements, he need not credit them to the extent

they are inconsistent with the objective medical evidence or to the extent the underlying

objective medical impairment could not reasonably be expected to cause the symptoms alleged.

<u>Id.</u>

The regulations set forth certain factors for the adjudicator to consider to determine the

extent to which the symptoms limit the claimant's capacity to work:

> 1) The individual's daily activities; 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) Type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. 404.1529(c) and 416.929(c) (2010).

Accompanying factors are provided in <u>SSR 96-7p</u> that the adjudicator must also consider,

in addition to the objective medical evidence, when assessing the credibility of an individual's

statements.  These factors include medical signs and laboratory findings; diagnosis, prognosis,

and other medical opinions provided by medical sources; and statements and reports about

claimant's medical history, treatment and response, prior work record and efforts to work, daily

activities, and other information concerning the claimant's symptoms and how the symptoms affect the individual's ability to work. SSR 96-7p.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

The Court finds Claimant's arguments that the ALJ's decision was not supported by substantial evidence to be without merit. Specifically, the Court finds that Claimant's limitation of sleep apnea was assessed by the ALJ in accordance with the regulations. The ALJ explicitly stated that in making her RFC finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" as well as "opinion evidence." See Transcript, pg. 15. In considering the medical evidence of Claimant's sleep apnea, the ALJ emphasized several inconsistencies between Claimant's medical record and Claimant's subjective symptoms. The ALJ did find that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms but found Claimant's statements concerning the intensity, persistence and limiting effects of the symptoms to be not credible. See Transcript, pg. 16. The

ALJ highlighted multiple instances in Claimant's medical record where Claimant did not complain of any respiratory symptoms: the May 7, 2008 neurological examination by Dr. Rahman, the February 25, 2009 initial visit to Dr. Pearson, and the April 8, 2009 examination by Dr. Pearson. The ALJ's task was to consider whether the record, as a whole, reasonably supported Claimant's allegations for the requisite twelve-month period. The Court does not agree with Claimant's assertion that "the ALJ largely based her decision on the erroneous finding that [Claimant's] condition had been successfully treated, but alternatively finds the ALJ's decision is supported by substantial evidence. The ALJ properly articulated her finding and the reasoning as to why Claimant's medical records did not support an assessment of disabling respiratory and related sleep apnea symptoms.

Additionally, the Court finds Claimant's argument that the ALJ decided Claimant's case using the ALJ's own medical opinion to reach a decision on "failure to follow prescribed treatment" grounds to be unpersuasive. Claimant argues that the ALJ "repeatedly relied on her belief that [Claimant] had not followed prescribed medical treatment as support for the negative credibility finding and as support for the RFC finding." See Pl.'s Mot. for Summ. J., pg. 12 (Dkt. 10). The Court, however, disagrees. The ALJ repeatedly cites to Claimant's medical reports for support throughout her decision. For example, the ALJ refers to Dr. Palade's report that "a BiPAP would be able to improve most of the Claimant's complaints and improve sleep continuity." Relative to the ALJ proffering "nothing more than her personal opinion as support for this finding," the Court finds the ALJ's analysis to be in line with the regulations. An ALJ is permitted to consider how symptoms limit a claimant's capacity for by considering other evidence such as Claimant's continued use of cigarettes or efforts of weight loss. See 20

C.F.R.§§ 404.1529(c)(1)-(4), 416.929(c)(1)-(4). This does not constitute the ALJ substituting her own medical opinion for that of the objective medical records nor does it comprise a decision resulting from "failure to follow prescribed treatment." Accordingly, Claimant's argument must fail.

Claimant also asserts the ALJ failed to consider relevant pulmonary testing results in the adjudication of Claimant's social security claim. The Court has considered Claimant's argument and finds it to be without support. The ALJ explicitly addresses the pulmonary function testing in her decision and explains her reasoning why the results were not considered. Specifically, the ALJ stated "that within the provisions of Section 3.00E of Appendix 1, the results of these studies cannot be considered in evaluating the Claimant's condition." <u>See</u> Transcript, pg. 15. Accordingly, Claimant's argument must fail.

### 2. Whether the ALJ Properly Excluded Claimant's Alleged Limitation of Daytime Drowsiness in the ALJ's RFC Assessment

Claimant argues the ALJ's decision was in error because the ALJ's RFC finding makes no mention of falling asleep during the day. Additionally, Claimant argues the VE's testimony was that there "was no allowance for sleeping on the job." Claimant contends the ALJ should have determined the frequency of Claimant's daytime sleeping episodes and then included that limitation in the RFC finding.

Commissioner argues the hypothetical scenario "contained all of Plaintiff's legitimate functional limitations that were reasonably established by the record." <u>See</u> Cmm'r Mot. for Summ. J., pg. 13 (Dkt. 9). Commissioner contends that with regard to Claimant's allegations of daytime sleepiness, ALJ explicitly found Claimant had exaggerated the nature and extent of his symptoms but still limited Claimant's RFC in the hypothetical to the VE. <u>Id.</u>

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3) (2010). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

A Residual Functional Capacity is what a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945 (West 2010). The Residual Functional Capacity assessment is based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of a claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons of claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a claimant from performing particular work activities. Id. The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact. 20 C.F.R. § 416.946.

The Fourth Circuit Court of Appeals has held an ALJ is not required to include work-

related limitations into a residual functional capacity assessment when those limitations are not supported by the record. Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). Additionally, while questions posed to the vocational expert must fairly set out all of the Claimant's impairments, the questions need only reflect those impairments supported by the record. Russell v. Barnhart, 58 Fed. Appx. 25, 30; 2003 WL 257494, at 4 (4th Cir. Feb. 7, 2003)[5]. The Court further stated that the hypothetical question may omit non-severe impairments but must include those that the ALJ finds to be severe. Id. Moreover, based on the evaluation of the evidence, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

The ALJ is afforded "great latitude in posing hypothetical questions." Koonce v. Apfel,[6] 166 F.3d 1209; 1999 WL 7864, at 5 (4th Cir. 1999) (citing Martinez, 807 F.2d, at 774). The ALJ need only pose those questions that are based on substantial evidence and accurately reflect the Claimant's limitations. Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988); see also Hammond v. Apfel,[7] 5 Fed. Appx. 101,105; 2001 WL 87460, at 4 (4th Cir. 2001).

The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434

---

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

[6] See note 5, *supra*.

[7] See note 6, *supra*.

F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)).  The

ALJ's decision must be upheld if it is supported by "substantial evidence."  42 U.S.C. §§ 405(g),

1383(c)(3).  Here, ALJ did not find Claimant's alleged limitation of daytime sleepiness to be

based on substantial evidence nor did the ALJ find it accurately reflected Claimant's limitations.

The ALJ specifically found "claimant has exaggerated the nature and extent of his impairments

and that his complaints of disabling functional limitations are not fully credible." See Transcript,

pg. 19).  Though Claimant argues the ALJ failed to include Claimant's limitations related to

being drowsy or falling asleep during the workday in the ALJ's RFC assessment, the ALJ is not

required to include limitations not supported by the record. See Gross v. Heckler, 785 F.2d,

1163, 1165 (4th Cir. 1986) (finding unsupported work-related limitations not required in residual

functional capacity assessment); Russell v. Barnhart, 58 Fed. Appx. 25, 30, 2003 WL 257494, at

*4 (4th Cir. Feb. 7, 2003) (finding questions need only reflect impairments supported by the

record).  The ALJ articulated the basis for her finding that Claimant's disabling functional

limitations were not fully credible.   The ALJ stated that Claimant's "medical records fail to

document any pulmonary complaints until March 2009," that "[Claimant] has required no

inpatient treatment for his alleged seizures or pulmonary problems and [Claimant] reported

improvement with the prescribed medication and use of the BiPAP machine." See Transcript, pg.

19.  The ALJ also found Claimant's reported activities to be inconsistent with the degree of

alleged functional limitations.  Additionally, the ALJ determined "Claimant had failed to

establish a basis for his complaints of periods of sleep during the day as he has failed to establish

an inability to use a BiPAP machine appropriately...." Id.  Overall, the ALJ highlighted that

"Claimant failed to document treatment for pulmonary complaints prior to March 2009 and after

March 2009, [Claimant] did not report respiratory symptoms on a sustained basis when seen by the treating source." Id. Claimant argues objective evidence supports the inclusion of daytime sleepiness into Claimant's RFC assessment. Specifically, Claimant argues Dr. Parson's recommendation was that Claimant avoid driving and attempting to work. The ALJ, however, is not bound by the conclusions of Dr. Parson, Claimant's treating physician, and appropriately explained the reasoning behind the ALJ's determination. A Claimant's RFC is reserved for the ALJ. Therefore, Claimant's argument must fail.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because Claimant's RFC is reserved for the ALJ.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: December 30, 2010

/s/ *James E. Seibert*

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE